**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| TELEMEDICINE SOLUTIONS LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 13 CV 3431 |
| v. | ) | |
| | ) | Judge Robert M. Dow, Jr. |
| WOUNDRIGHT TECHNOLOGIES, LLC, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Telemedicine Solutions LLC and Defendant WoundRight Technologies, LLC are purveyors of electronic systems and products aimed at medical practitioners in the wound care field. Plaintiff's system is called WoundRounds; Defendant's, WoundRight. In its twelve-count amended complaint against Defendant [27], Plaintiff alleges that Defendant has infringed and diluted Plaintiff's trademark; engaged in unfair competition, cyberpiracy, and deceptive trade practices; disparaged and defamed Plaintiff; and tortiously interfered with Plaintiff's prospective economic advantage. Defendant has moved to dismiss Plaintiff's amended complaint for lack of personal jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(2), or for improper venue pursuant to Rule 12(b)(3). [28]. In the alternative, Defendant seeks to transfer venue to Wyoming pursuant to 28 U.S.C. §§ 1404(a) & 1406(a), and dismiss Counts X, XI, and XII of Plaintiff's complaint pursuant to Rule 12(b)(6). [28]. Plaintiff opposes the motion and requests leave to engage in "jurisdictional discovery to refute" affidavit testimony submitted by Defendant, to "determine how much WoundRight knew about WoundRounds (or Telemedicine), and [to ascertain] whether WoundRight has other minimum contacts with Illinois, in addition to its electronic entry into Illinois and its intentional tortious conduct[ ]

directed at Illinois and Illinois consumers." [33] at 3, 11, 15; [40] at 2, 8.

For the reasons stated below, the Court concludes that it lacks personal jurisdiction over Defendant and accordingly grants Defendant's motion [28] and dismisses the amended complaint for lack of personal jurisdiction. The Court respectfully denies Plaintiff's requests for jurisdictional discovery.

## I.    Background

For the purposes of the instant motion, the Court accepts as true the factual allegations relevant to jurisdiction made in Plaintiff's amended complaint, and draws all reasonable inferences in its favor. *Cent. States, Se. & Sw. Area Pension Fund v. Phencorp Reinsurance Co., Inc.*, 440 F.3d 870, 878 (7th Cir. 2006)    The Court also resolves any disputes concerning relevant facts in Plaintiff's favor. *Purdue Research Found. v. Sanofi-Synthelabo, S.A.*, 338 F.3d 773, 782 (7th Cir. 2003).   To the extent that Defendant has submitted affidavits opposing jurisdiction or contradicting Plaintiff's allegations, however, Plaintiff must go beyond the pleadings and submit affirmative evidence supporting the exercise of jurisdiction. *Id.* at 783.

Plaintiff is a limited liability company that was organized under the laws of Illinois in July 2005. [27] ¶¶ 3, 17.   Its principal place of business is Schaumburg, Illinois. *Id.* ¶ 3.  Soon after its organization, Plaintiff entered the wound care industry, promoting, marketing, selling, and providing services related to its "Wound Rounds" system, an electronic documentation and wound care management system that enables medical providers to identify and manage patients at risk for pressure ulcers. *Id.* ¶ 17.  Plaintiff obtained and registered the domain name "woundrounds.com" in February 2006, and thereafter augmented its online presence by using social media sites such as YouTube, Facebook, LinkedIn, and Twitter. *Id.* ¶ 18. Plaintiff made its "WoundRounds" software and hardware, as well as Internet-based health care information

services, available "[a]t least as early as November 1, 2006." *Id.* ¶¶ 19-20. Beginning in March 2007, Plaintiff added educational services such as webinars, seminars, teleconferences, and social media presentations to its "WoundRounds" offerings, *id.* ¶ 21, and has provided downloadable webinars since early 2010. *Id.* ¶ 22. Plaintiff recently secured federal trademark registrations for its "WOUND ROUNDS" system and stylized logo, and has applied for a federal trademark for another stylized version of its "WoundRounds" mark. *Id.* ¶ 23; *id.* Ex. 1.

Plaintiff's substantial investments into its product and marketing have paid off. Its "WoundRounds" marks have become well-known throughout the wound care industry as emanating from Plaintiff alone, *id.* ¶ 24, and have provided Plaintiff with a strong national reputation and considerable goodwill with an estimated worth in the millions. *Id.* ¶¶ 25-26.

Defendant is a limited liability company organized under the laws of Wyoming with its principal place of business in Laramie, Wyoming. *Id.* ¶ 2. Defendant uses the term "WoundRight" to denote its goods and services, which according to Plaintiff are "the same or nearly identical" to Plaintiff's "WoundRounds" goods and services. *Id.* ¶ 27. Defendant's affidavit describes its "WoundRight" products as "a complete mobile wound care solution that automate[s] assessment documentation for wounds, ostomies, and incontinence management." [29-1] ¶ 8. Defendant's "WoundRight" electronic application ("app") is intended for use on mobile devices, *id.* ¶ 7, and it is available for download from third-party websites that can be accessed from Defendant's website, "woundrightapp.com." [27] ¶ 33; [29-1] ¶¶ 20, 25-26, [29-2] ¶¶ 7-8. Defendant's website, which was registered on May 15, 2012, [27] ¶ 32, can be accessed by customers anywhere in the United States, see [27] ¶ 33, but customers cannot actually download the WoundRight app directly from the website. See [27] ¶ 33; [29-1] ¶¶ 20, 25-26, [29-2] ¶¶ 7-8. Customers likewise cannot purchase supplemental "census credits" to

expand the utility of the app without placing a telephone call to Defendant's Wyoming office. [29-1] ¶¶ 25-27; [29-2] ¶¶ 7-15. Defendant does not have (and never has had) any physical presence in Illinois. [29-1] ¶¶ 31-36. Defendant never has sold any products or services to customers in Illinois. [29-1] ¶ 28. It has sent employees to demonstrate and sell its products at industry conferences around the country, but none of those conferences was in Illinois. See [27] ¶ 36; [29-1] ¶¶ 40-41. Plaintiff alleges that Defendant's actions nonetheless specifically targeted the Illinois market for an electronic wound care and management software system. [27] ¶ 12.

Defendant, like Plaintiff, maintains a presence on the Internet beyond its website. Defendant uses social media, including Facebook and Twitter, to communicate with potential customers throughout the United States. [27] ¶ 35; *id.* Ex. 7-8; [29-2] ¶¶ 19, 21. Through these social media channels, Defendant promotes its product and calls attention to the wound care field generally. For instance, in December 2012, Defendant tweeted, "Close the gap between research and clinical practice with WoundRight." [27] ¶ 45; *id.* Ex. 10. This tweet included a link to an article authored by several individuals associated with Plaintiff (and expressly identified as such). [27] ¶ 45; *id.* Ex. 10. Defendant also uses social media channels to interact with individuals in a number of states, [27] ¶ 37, though it has not specifically targeted either its Facebook postings or Twitter tweets to consumers in Illinois. [29-2] ¶ 19. For instance, on June 23, 2013 Defendant tweeted, "It was along day that was highlighted by a nurse from Johnston,IA. She uses W.R. daily and could not stop telling us how much she loves it. Made our day!!!" [27] ¶ 46; *id.* Ex. 11. And in February 2013, Defendant mentioned on its Facebook page that the sister of its CEO uses Defendant's product in her "1,000 square mile" nursing practice based in Thurston, Nebraska. [27] ¶ 38; *id.* Ex. 9. Although Illinois theoretically could be within an area of this size, see [27] ¶ 38, Defendant has submitted affidavit testimony averring

that the sister of its CEO "is ___not___ licensed as a nurse in any state other than Nebraska, [and] she does ___not___ work outside of the state of Nebraska." [29-2] ¶ 5.

Defendant at some point purchased a Google AdWords ad that appeared as the top result when a user searched Google for the term "woundrounds." [27] ¶ 28; *id.* Ex. 3. The text-only ad included a link to Defendant's website and read, "Considering WoundRounds? – Don't waste your time[.] Try the latest wound care app for free!" [27] Ex. 3. Plaintiff alleges that the Google ad "falsely indicates that Telemedicine's products and/or services are a 'waste of time' and otherwise disparagingly suggests that Telemedicine's products and/or services are poor, inferior in some unknown manner, should not be used, and/or would be a waste of time to use, when in fact they are not." [27] ¶ 30. Similarly, Plaintiff alleges, the Google ad "misrepresents the nature, characteristics, and/or qualities of Telemedicine and its goods and/or services." *Id.* Defendant's CEO contends in his affidavit that Defendant "has never placed any internet advertisements or sent any email advertisements that are specifically directed at or targeted to individuals or businesses located in Illinois." [29-1] ¶ 38. As to the Google ad, he avers that "the advertisement was not targeted at Illinois individuals and/or businesses, the advertisement ran for only five days, and the advertisement will not be run again by WoundRight." [29-1] ¶ 39. The CEO further asserts that "[p]rior to the filing of this lawsuit, WoundRight was unaware of Telemedicine's existence, was unaware that WoundRound^TM products and services were affiliated with Telemedicine, and was unaware that Telemedicine resided in Illinois and operated its business in Illinois." [29-2] ¶ 17. Additionally, he avers that "WoundRight has not purposely exploited the Illinois market for its business, either by advertising its products and services on its web-site or otherwise." [29-1] ¶ 46.

Plaintiff alleges that Defendant has transacted business in Illinois via its advertising,

marketing, and solicitation activities; its website; and its placement of its product into the stream of commerce in Illinois. [27] ¶¶ 7-8. Plaintiff also alleges that Defendant specifically targeted Plaintiff and its business in Illinois by using a confusingly similar trademark, intentionally attempting to cause confusion or create a false association between its product and Plaintiff, misappropriating Plaintiff's Illinois clients and consumers, and willfully attempting to damage Plaintiff and its business. [27] ¶ 9. Plaintiff alleges that Defendant's Google ad specifically attacked Plaintiff, its reputation, and its goodwill in Illinois; targeted Plaintiff's customers or potential customers searching for Plaintiff or its product in Illinois; tortiously defamed Plaintiff; tortiously interfered with Plaintiff's prospective business advantage; and was directed at Illinois with the full knowledge that Plaintiff would be injured in Illinois. [27] ¶ 10. Plaintiff further alleges that Defendant committed acts of unfair competition by "intentionally creating a false association Telemedicine in Illinois * * *, deceptively creating the false and/or mistaken consumer belief that that Defendant's products and services emanate[ ] from Telemedicine in Illinois * * *, by attempting to misappropriate consumers in Illinois * * * searching the internet for Telemedicine in Illinois * * *, and otherwise damaging the business interests of Telemedicine in Illinois * * * *" [27] ¶ 11.

## II.   Discussion

### A.   Personal Jurisdiction

Notwithstanding the parties' apparent preference that the Court address the merits of Defendant's Rule 12(b)(6) arguments, see [29] at 8, [33] at 3-6; [35] at 1-4; [40] at 2-5, the Court resolves the question of personal jurisdiction first because "failure to address jurisdiction before addressing the merits of constitute[s] error." *Yassan v. J.P. Morgan Chase & Co.*, 708 F.3d 963, 967 n.1 (7th Cir. 2013) (citing *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 93 (1998)).

Indeed, because "[p]ersonal jurisdiction refers to a court's 'power to bring a person into its adjudicative process,'" *N. Grain Mktg., LLC v. Greving*, --- F.3d ----, 2014 WL 595767, at *3 (7th Cir. Feb. 18, 2014) (quoting BLACK'S LAW DICTIONARY 930 (9th ed. 2009)), and "principally protects the liberty of the nonresident defendant," *Walden v. Fiore*, --- S. Ct. ---, 2014 WL 700098, at *7 n.9 (Feb. 25, 2014), it must be the "first and fundamental question" resolved, "even when not otherwise suggested, and without respect to the relation of the parties to it." *Steel Co.*, 523 U.S. at 94 (quoting *Great S. Fire Proof Hotel Co. v. Jones*, 177 U.S. 449, 453 (1900)).

### 1.      Legal Standard

Plaintiff asserts claims arising under the Lanham Act, Illinois statutory law, and the common law. The Lanham Act does not authorize nationwide service of process, so this Court sitting in Illinois may exercise jurisdiction over Defendant only if authorized both by the United States Constitution and Illinois law. *be2 LLC v. Ivanov*, 642 F.3d 555, 558 (7th Cir. 2011) (citing Fed. R. Civ. P. 4(k)(1)(A); *Tamburo v. Dworkin*, 601 F.3d 693, 700 (7th Cir. 2010)). The Illinois long-arm statute "permits its courts to exercise personal jurisdiction on any basis permitted by the constitutions of both Illinois and the United States." *Id.*; see 735 ILCS 5/2-209(c). Thus "the state statutory and federal constitutional inquiries merge." *Tamburo*, 601 F.3d 693, 700 (7th Cir. 2010).

The federal test for personal jurisdiction under the Due Process Clause of Fourteenth Amendment authorizes a court to exercise jurisdiction over a non-resident defendant only if the defendant has "certain minimum contacts with [the state] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (quoting *Milliken v. Meyer*, 311 U.S. 457, 463 (1940)).

In other words, "it is essential in each case that there be some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." *Hanson v. Denckla*, 357 U.S. 235, 253 (1958). The requirement that a defendant have "minimum contacts" with the forum ensures that a non-resident defendant will not be forced to litigate in a jurisdiction as a result of "random, fortuitous, or attenuated contacts" with the forum or the unilateral activity of the plaintiff; the defendant "should reasonably anticipate being haled into court" there. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 474-75 (1985). Plaintiff relies exclusively on a theory of specific personal jurisdiction, see [33] at 7-11, which means that it must show that the alleged controversy between the parties "arise[s] out of" or "relate[s] to" the defendant's forum contacts in addition to establishing that minimum contacts exist. *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414 (1984); see also *Walden*, 2014 WL 700098, at *4 ("For a State to exercise jurisdiction consistent with due process, the defendant's suit-related conduct must create a substantial connection with the forum State.").

The purposeful availment inquiry "can appear in different guises," *Tamburo*, 601 F.3d at 702 (quoting *Dudnikov v. Chalk & Vermilion Fine Arts, Inc.*, 514 F.3d 1063, 1071 (10th Cir. 2008)), and this case presents two variations on the standard theme. First, Plaintiff alleges that Defendant committed several intentional torts (in addition to statutory and common law violations). The Seventh Circuit and the Supreme Court have held that "constitutionally sufficient contacts can be imputed to a defendant if the defendant is accused of committing an intentional tort by actions that are 'expressly aimed' at the forum state." *Mobile Anesthesiologists Chi., LLC v. Anesthesia Assocs. of Houston Metroplex, P.A.*, 623 F.3d 440, 444 (7th Cir. 2010) (citing *Calder v. Jones*, 465 U.S. 783, 789-90 (1984)); see *Walden v. Fiore*, --- S.

Ct. ---, 2014 WL 700098, at *6 (Feb. 25, 2014) ("A forum State's exercise of jurisdiction over an out-of-state intentional tortfeasor must be based on intentional conduct by the defendant that creates the necessary contacts with the forum."). The Seventh Circuit has characterized this inquiry as an "express aiming" test, *Tamburo*, 601 F.3d at 697, and explained that it requires "(1) intentional conduct (or 'intentional and allegedly tortious' conduct; (2) expressly aimed at the forum state; (3) with the defendant's knowledge that the effects would be felt – that is, plaintiff would be injured – in the forum state." *Id.* at 703 (citing *Calder v. Jones*, 465 U.S. 783, 789-90 (1984)); see also *Mobile Anesthesiologists*, 623 F.3d at 445. The "express aiming" test "focuses attention on whether the defendant intentionally aimed its conduct at the forum state, rather than on the possibly incidental and constitutionally irrelevant effects of that conduct on the plaintiff." *Mobile Anesthesiologists*, 623 F.3d at 445 n.1. Indeed, the Supreme Court has emphasized that "[t]he proper question is not where the plaintiff experienced a particular injury or effect but whether the defendant's conduct connects him to the forum in a meaningful way." *Walden*, 2014 WL 700098, at *7.

The Supreme Court also has emphasized that the "express aiming" test is not an alternative to the minimum contacts inquiry. As the Court explained last month in *Walden*, "[t]hese same principles apply when intentional torts are involved. In that context, it is likewise insufficient to rely on a defendant's random, fortuitous, or attenuated contacts, or on the unilateral activity of a plaintiff. A forum State's exercise of jurisdiction over an out-of-state intentional tortfeasor must be based on intentional conduct by the defendant that creates the necessary contacts with the forum." *Walden*, 2014 WL 700098, at *6 (quotations and citation omitted)). In the words of the Seventh Circuit, the "express aiming" test is "merely one means of satisfying the traditional due process standard set out in *International Shoe* and its familiar

progeny." *Mobile Anesthesiologists*, 623 F.3d at 445. Thus, to the extent that the "express aiming" test applies to this mixed-claims case, it is part of the broader minimum contacts query.

The second wrinkle in this case is that Defendant's alleged contacts with the forum state occurred almost exclusively via the Internet. The Seventh Circuit long has been "hesit[ant] to fashion a special jurisdictional test for Internet-based based cases," *Tamburo*, 601 F.3d at 703 n.7, and indeed has concluded that "[u]sing a separate test for Internet-based contacts would be inappropriate" because the traditional minimum contacts analysis "remains up to this more modern task." *uBid, Inc. v. The GoDaddy Group, Inc.*, 623 F.3d 421, 431 n.1 (7th Cir. 2010). Nonetheless, in cases in which the defendant's alleged contacts with the forum state occurred online, the Seventh Circuit has noted that the relevant inquiry typically "boils down" to whether the defendant has purposely exploited or in some way targeted the forum state's market. *be2 LLC*, 642 F.3d at 558-59. "If the defendant merely operates a website, even a 'highly interactive' website, that is accessible from, but does not target, the forum state, then the defendant may not be haled into court in that state without offending the Constitution." *Id.* at 559; see also *Illinois v. Hemi Grp., LLC*, 622 F.3d 754, 760 (7th Cir. 2010) ("Courts should be careful in resolving questions of personal jurisdiction involving online contacts to ensure that a defendant is not haled into court simply because the defendant owns or operates a website that is accessible in the forum state, even if that site is 'interactive.'"). Thus, "[a] plaintiff cannot satisfy the *Calder* standard [*i.e.*, the "express aiming" test] simply by showing that the defendant maintained a website accessible to residents of the forum state and alleging that the defendant caused harm through that website." *Mobile Anesthesiologists*, 623 F.3d at 446. That is true even where the defendant maintains its website after being placed on notice of the allegedly harmed entity's identity, location, and ownership of a similar trademark. See *id.* at 444; *cf. Walden*, 2014

WL 700098, at *7 ("Petitioner's actions in Georgia did not create sufficient contacts with Nevada simply because he allegedly directed his conduct at plaintiffs whom he knew had Nevada connections.").

If minimum contacts related to the suit are present, before exercising jurisdiction the Court also must consider whether the exercise of personal jurisdiction comports with "traditional notions of fair play and substantial justice." *Burger King*, 471 U.S. at 476 (quoting *Int'l Shoe*, 326 U.S. at 320). "Thus, courts in 'appropriate cases' may evaluate 'the burden on the defendant,' 'the forum State's interest in adjudicating the dispute,' 'the interstate judicial system's interest in obtaining convenient and effective relief,' 'the interstate judicial system's interest in obtaining the most efficient resolution of controversies,' and 'the shared interest of the several States in furthering fundamental substantive social policies.'" *Burger King*, 471 U.S. at 477 (quoting *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 292 (1980)). These considerations are sometimes used to establish the reasonableness of jurisdiction in lieu of a strong showing of minimum contacts. *Burger King*, 471 U.S. at 477 (citing *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 780 (1984)).

Where, as here, the issue of personal jurisdiction is raised by a motion to dismiss and is decided on the basis of written materials, Plaintiff has the burden of making a *prima facie* case of jurisdictional facts. *Tamburo*, 601 F.3d at 700. Jurisdictional allegations pleaded in the complaint are accepted as true unless proved otherwise by affidavits or exhibits. See *Purdue Research Found. v. Sanofi-Synthelabo, S.A.*, 338 F.3d 773, 782 (7th Cir. 2003). Plaintiff is entitled to the resolution in its favor of all disputes concerning relevant facts presented in the record. *Id.* That said, Plaintiff may not merely rest on the allegations in its amended complaint; "once the defendant has submitted affidavits or other evidence in opposition to the exercise of

jurisdiction, the plaintiff must go beyond the pleadings and submit affirmative evidence supporting the exercise of jurisdiction." *Id.* at 783.

## 2. Analysis

Here, Defendant maintains a website, uses social media, attends industry conferences, and ran a Google ad. Plaintiff contends that these activities subject Defendant to personal jurisdiction in Illinois because it intentionally has:

> (1) used Plaintiff's trade name and trademark as a search keyword in the Google ad with the intention of diverting Plaintiff's customers and potential customers to its own website;
>
> (2) defamed Plaintiff and its product in the Google ad by suggesting that Plaintiff's product is a waste of time;
>
> (3) disparaged Plaintiff's goods and/or services in the Google ad by indicating that they are a waste of time;
>
> (4) adopted and used a confusingly similar name to Plaintiff's trade name and trademark and misappropriated the goodwill associated with them; and
>
> (5) attempted to create actual confusion to deceive customers, consumers, industry personnel, and the general public as to the source of Defendant's goods and/or services and their affiliation or connection with Plaintiffs'.

[33] at 7. These five alleged acts essentially collapse into two actions on Defendant's part: running the Google ad and using the name and mark "WoundRight" across several platforms. Plaintiff contends that these contacts are sufficient to support the exercise of personal jurisdiction in Illinois under *Tamburo v. Dworkin*, 601 F.3d 693 (7th Cir. 2010), and its articulation of the "express aiming" test originally established in *Calder v. Jones*, 465 U.S. 783 (1984). See [33] at 9 ("Jurisdiction is proper because WoundRight's express aim was to tortiously interfere with an Illinois company's sales and because the injury occurred in Illinois."). Plaintiff relies almost exclusively on *Tamburo* to support its jurisdictional argument. See [33] at 7-11; [40] at 5-7. (It

12

cites a portion of *Tamburo*'s discussion of *Janmark, Inc. v. Reidy*, 132 F.3d 1200 (7th Cir. 1997), see [33] at 9, and independently cites *Janmark* in its sur-reply. See [40] at 6.). However, *Tamburo* is but one of several Seventh Circuit cases clarifying and applying *Calder*'s "express aiming" test. A close examination of some of those cases leads the Court to conclude that Defendant's contacts with Illinois do not surpass the requisite threshold to support the exercise of personal jurisdiction in this case.

As explained in *Tamburo* (and several other Seventh Circuit cases), the Supreme Court's decision in *Calder v. Jones*, 465 U.S. 783 (1984), "provides some contours for the 'purposeful direction' requirement in the context of a suit alleging intentional torts." *Tamburo*, 601 F.3d at 702; see also *Walden*, 2014 WL 700098, at *6 ("*Calder v. Jones*, 465 U.S. 783, illustrates the application of these principles."). In *Calder*, plaintiff Shirley Jones of *Partridge Family* fame sued defendants National Enquirer, Inc., its local distributing company, and a *National Enquirer* reporter and editor after they wrote, edited, published, and distributed an allegedly libelous article about her. See *Calder*, 465 U.S. at 784-86. The *National Enquirer* is based in Florida, and the article was written and published there. Plaintiff sued in California, however, which is where she lived, and where 600,000 copies of the issue containing the article were distributed. National Enquirer, Inc., and the local distributing company acceded to the exercise of personal jurisdiction over them, but the writer and editor of the story argued that they were not subject to personal jurisdiction in California because they were not responsible for the magazine's distribution in California, they had no economic stake in its sales there, and the foreseeability of the article's effect on Jones was not sufficient to confer jurisdiction. See *id.* at 785-87; see also *Tamburo*, 601 F.3d at 702. The Supreme Court rejected the writer's and editor's arguments, explaining,

> Petitioner South wrote and Petitioner Calder edited an article that they knew would have a potentially devastating impact upon [Jones]. And they knew that the brunt of that injury would be felt by [Jones] in the state in the State in which she lives and works and in which the *National Enquirer* has its largest circulation. Under the circumstances, petitioners must 'reasonably anticipate being haled into court there' to answer for the truth of the statements made in their article. An individual injured in California need not go to Florida to seek redress from persons who, though remaining in Florida, knowingly cause the injury in California.

*Calder*, 789-90 (citations omitted). The Supreme Court recently reiterated that "[t]he crux of *Calder* was that the reputation-based 'effects' of the alleged libel connected the defendants to California, not just to the plaintiff." *Walden*, 2014 WL 700098, at *6.

The Seventh Circuit has distilled from the Supreme Court's analysis in *Calder* a three-pronged "express aiming" test for personal jurisdiction in the context of intentional torts: "(1) intentional conduct (or 'intentional and allegedly tortious conduct'); (2) expressly aimed at the forum state; (3) with the defendant's knowledge that the effects would be felt – that is, the plaintiff would be injured – in the forum state." *Tamburo*, 601 F.3d at 703. The court has recognized that although these requirements are fairly straightforward, applying them in specific cases, particularly those alleging tortious acts committed over the Internet, can be challenging. *Id.*; see also *uBid, Inc. v. The GoDaddy Grp., Inc.*, 623 F.3d 421, 433 (7th Cir. 2010) ("We recognize that our analysis here does not provide crisp, bright lines for district courts and litigants, but this is a field of law where the Supreme Court has repeatedly refused opportunities to draw such bright lines."). Indeed, the Seventh Circuit has acknowledged that its own application of the test has evolved over time. See *Mobile Anesthesiologists*, 623 F.3d at 445; *Tamburo*, 601 F.3d at 704. The Court discusses some of the highlights below.

In *Wallace v. Herron*, 778 F.2d 391 (7th Cir. 1985), a plaintiff from Indiana sued defendants from California in his home forum of Indiana. The plaintiff alleged that the

defendants maliciously prosecuted him in California. See *Wallace*, 778 F.2d at 392. The district court dismissed the case for lack of personal jurisdiction, and the Seventh Circuit affirmed. The court rejected plaintiff's contention that *Calder* stood for the proposition that "any plaintiff may hale any defendant into court in the plaintiff's home state, where the defendant has no contacts, merely by asserting that the defendant has committed an intentional tort against the plaintiff." *Wallace*, 778 F.2d at 394; see also *Mobile Anesthesiologists*, 623 F.3d at 445. The *Wallace* court reasoned that "the key to *Calder* is that the effects of an alleged intentional tort are to be assessed as part of the analysis of the defendant's relevant contacts with that forum. Whether these effects, either alone or in combination with other contacts, are sufficient to support *in personam* jurisdiction will turn upon the particular facts of each case." *Wallace*, 778 F.2d at 395. That is, "*Calder* did not alter the prevailing jurisdictional requirement that the defendant must engage in conduct that 'create[s] a "substantial connection" with the forum state.'" *Tamburo*, 601 F.3d at 705 (quoting *Wallace*, 778 F.2d at 395); accord *Walden*, 2014 WL 700098, at *6. Because the defendants' only connections with Indiana were the legal papers they served on Wallace there, the court found personal jurisdiction wanting even though plaintiff had alleged an intentional tort. See *Wallace*, 778 F.2d at 395. The court found the case to be distinguishable from *Calder*, where the harm alleged "was uniquely related to California because the emotional distress and injury to professional reputation suffered by the plaintiff were primarily a result of the publication of the story to other California residents." *Id.*; accord *Walden*, 2014 WL 700098, at *6.

The Seventh Circuit suggested a more expansive view of *Calder* in two subsequent cases, *Indianapolis Colts, Inc. v. Metropolitan Baltimore Football Club Ltd. Partnership*, 34 F.3d 410 (7th Cir. 1994), and *Janmark, Inc. v. Reidy*, 132 F.3d 1200 (7th Cir. 1997). Although the court

has since expressly clarified that it "view[s] *Wallace* as a correct statement of the standard set down by the Supreme Court," *Mobile Anesthesiologists*, 623 F.3d at 445,[1] *Indianapolis Colts* and *Janmark* nonetheless remain valid and offer insight into the complex and evolving nature of the "express aiming" test. In *Indianapolis Colts*, the court suggested that the state in which the alleged victim of a tort suffers the injury of that tort automatically may obtain personal jurisdiction over the alleged tortfeasor. See *Indianapolis Colts*, 34 F.3d at 412; see also *Mobile Anesthesiologists*, 623 F.3d at 445; *Tamburo*, 601 F.3d at 705-06. The court actually held, however, that it "need not rest on so austere a conception of the basis of personal jurisdiction" because the plaintiff was injured in Indiana *and* the defendant planned to "enter" Indiana by way of national broadcasts of its football games. See *Indianapolis Colts*, 34 F.3d at 412; see also *Mobile Anesthesiologists*, 623 F.3d at 445; *Tamburo*, 601 F.3d at 705-06. Similarly, in *Janmark*, the court concluded that a court in Illinois had personal jurisdiction over a California shopping-cart manufacturer that allegedly interfered with the business interests of an Illinois shopping-cart manufacturer by infringing on the latter's cart design and threatening one of its customers in New Jersey. See *Janmark*, 132 F.3d at 1202-03. The court emphasized the importance of plaintiff's injury in Illinois, see *id.*, and "did not discuss whether the defendants in that case had expressly aimed their conduct at the forum state, or even whether the defendants knew the plaintiff was located there or had suffered harm there." *Mobile Anesthesiologists*, 623 F.3d at 445.

The Seventh Circuit has acknowledged that "*Janmark* is hard to reconcile with *Wallace*

---

[1] The Seventh Circuit was prescient in this regard. The Supreme Court very recently emphasized – in a case not cited or brought to the Court's attention as supplemental authority by either party – that "*Calder* made clear that mere injury to a forum resident is not a sufficient connection to the forum. Regardless of where a plaintiff lives or works, an injury is jurisdictionally relevant only insofar as it shows that the defendant has formed a contact with the forum State." *Walden v. Fiore*, --- S. Ct. ---, 2014 WL 700098, at *7 (Feb. 25, 2014).

and to a lesser extent, with *Indianapolis Colts* – at least if *Janmark* is understood as broadly authorizing personal jurisdiction wherever a tort victim is injured." *Tamburo*, 601 F.3d at 705. But the three cases nonetheless can be harmonized because all three "read *Calder* to require a forum-state injury *and* 'something more' directed at that state before jurisdiction over a foreign defendant may be considered proper." *Id.* at 706. Even in *Janmark*, the court "ultimately considered the relationship between the allegedly tortious conduct and the forum state itself." *Id.*; accord *Walden*, 2014 WL 700098, at *8 ("The proper focus of the 'minimum contacts' inquiry in intentional-tort cases is 'the relationship among the defendant, the forum, and the litigation.' (quoting *Calder*, 465 U.S. at 788)). It is this "injury plus" view of the *Calder* "express aiming" test that the Seventh Circuit consistently has applied in its more recent line of relevant case law, beginning with *Tamburo v. Dworkin*, 601 F.3d 693 (7th Cir. 2010).

In *Tamburo*, the plaintiff was an Illinois resident who operated a dog-breeding software business. He alleged that the defendants used the Internet to retaliate against him for copying dog-breeding data they had posted online. Specifically, the plaintiff alleged that several of the defendants, who were scattered across the United States and Canada, "engaged in a concerted campaign of blast emails and postings on their websites accusing him of stealing their data and urging dog enthusiasts to boycott his product." *Tamburo*, 601 F.3d at 697. "In some of these messages, readers were encouraged to boycott Tamburo's products; in others, Tamburo's Illinois address was supplied and readers were urged to contact and harass him." *Id.* at 706. One of these defendants personally contacted plaintiff by e-mail, accused him of theft, and demanded that he remove the stolen data from his website. *Id.* Plaintiff also claimed that these defendants sent some of their messages to another defendant that was located in Australia. The Australian defendant in turn posted the messages to a private listserv aimed at the dog-breeding community.

*Id.* at 697. Applying the "injury plus" variant of the *Calder* "express aiming" test, the court concluded that the American and Canadian defendants "expressly aimed" their conduct at Illinois, but that the Australian defendant did not. See *id.* at 706-08.

As to the American and Canadian defendants, the court found important plaintiff's unrefuted allegations that these defendants "specifically aimed their tortious conduct at Tamburo and his business in Illinois with the knowledge that he lived, worked, and would suffer the 'brunt of the injury' there." *Tamburo*, 601 F.3d at 707. The court reiterated that the American and Canadian defendants "purposely targeted Tamburo and his business in Illinois with the express goal of inflicting commercial and reputational harm on him there, even though their alleged defamatory and otherwise tortious statements were circulated more diffusely across the Internet." *Id.* It contrasted this behavior with that of the Australian defendant, over whom it concluded the exercise of personal jurisdiction was improper. That defendant "allegedly facilitated the posting of some of the individual defendants' tortious messages on the company's private Breedmate Yahoo! listserve." *Id.* at 708. The court was unable to "conclude that [the Australian defendant's] reposting of an unspecified number of messages of unspecified (but tortious) content to a private listserve of unspecified scope and reach is enough to establish that [the Australian defendant] 'expressly aimed' its allegedly tortious conduct at Illinois." *Id.* Important to the court in this regard was the absence of allegations that the Australian defendant "reposted emails specifically calling for a boycott of Tamburo's Illinois-based business," or that "anyone associated with" the Australian defendant "acted with the knowledge that Tamburo operated his business in Illinois or with the specific purpose of inflicting injury there." *Id.* The court also noted that "[i]n a case involving stand-alone Internet-based defamation, *Calder* might require a showing that the defendant intended to reach forum-state readers." *Id.* at 708 n.10.

The Seventh Circuit has continued to endorse the "injury plus" variant of the *Calder* test in cases subsequent to *Tamburo*. In *uBid, Inc. v. The GoDaddy Group, LLC*, 623 F.3d 421, 427 (7th Cir. 2010), which involved allegations of cybersquatting and trademark infringement, the court found it unnecessary to apply the *Calder* test because the defendant's "actual contacts with Illinois meet the constitutional standard for minimum contacts." *Id.* at n.1. The court nonetheless noted that "*Calder* can be read as authorizing personal jurisdiction in the home state of the victim of almost any alleged intentional tort, but it need not and should not be read so broadly. *Tamburo*, *Wallace*, and *Indianapolis Colts* [ ] are consistent in requiring 'something more' beyond injury in the forum state from an alleged intentional tort." *Id.* The court also emphasized that plaintiffs seeking to establish personal jurisdiction on the basis of Internet contacts "must still prove that the defendant had constitutionally sufficient contacts with the forum and that the defendant's contacts were temporally and substantively related to the lawsuit. Without that showing, the mere fact that the defendant allegedly caused harm by conducting business or advertising over the Internet is not adequate to establish jurisdiction in the plaintiff's chosen forum state." *Id.* at 431. The court additionally cautioned against "adopting an overly expansive test of jurisdiction for internet-based commerce." *Id.* at 432.

The Seventh Circuit continued on this trajectory in *Mobile Anesthesiologists Chicago, LLC v. Anesthesia Associates of Houston Metroplex, P.A.*, 623 F.3d 440 (7th Cir. 2010), in which it did have occasion to apply the *Calder* test. In *Mobile Anesthesiologists*, an anesthesiology business based in Chicago registered and used the website www.mobileanesthesiologists.com, and owned and used the federally registered trademark MOBILE ANESTHESIOLOGISTS. 623 F.3d at 442. The defendant, a one-man anesthesiology practice based in Houston, Texas, registered the domain name www.mobileanestheia.com and

provided anesthesiology services in the Houston area. After the defendant failed to respond to the plaintiff's cease-and-desist letter, the plaintiff sued the defendant in Illinois federal court under the federal anti-cybersquatting statute. The plaintiff contended that the defendant should be amenable to suit in Illinois because it "maintained a website with a name similar to [plaintiff's] trademark, with constructive notice of that trademark thanks to [plaintiff's] federal registration," and "after receiving the cease-and-desist letter, maintained its website with actual notice of [plaintiff's] identity, location, and ownership of a similar mark." *Id.* at 444. The Seventh Circuit rejected this argument and found the plaintiff's evidence that defendant "took express aim at Illinois" to be "inadequate." *Id*. at 446. Echoing the reluctance it expressed in *uBid* to creating an overly expansive test of jurisdiction in the Internet context, the court held that "[a] plaintiff cannot satisfy the *Calder* standard simply by showing that the defendant maintained a website accessible to residents of the forum state and alleging that the defendant caused harm through that website." *Id.* (citing *Panavision Int'l, L.P. v. Toeppen*, 141 F.3d 1316, 1322 (9th Cir. 1998)). Although the court recognized that "[a] defendant's deliberate and continuous exploitation of the market in a forum state, accomplished through its website as well as through other contacts with the state, can be sufficient to establish personal jurisdiction," *id.* at 446, it found only an insignificant "relationship among the defendant, the forum, and the litigation" in this instance. *uBid, Inc*., 623 F.3d at 433 (quotation omitted). The court also rejected plaintiff's contentions that defendant "expressly aimed" its activities at Illinois after receiving the cease-and-desist letter. *Mobile Anesthesiologists*, 623 F.3d at 446-47. It found "express aiming" lacking under the "injury plus" test: "[t]o find express aiming based solely on the defendant's receipt of that letter would make any defendant accused of an intentional tort subject to personal jurisdiction in the plaintiff's home state as soon as the defendant learns what that state is. *Calder*

requires more." *Id.* at 447. In doing so, the court made clear that the "more" must relate to the forum state; it stated that "the cases that have found express aiming have all relied on evidence beyond the plaintiff's mere residence in the forum state." *Id.* To illustrate this point, it highlighted the *Calder* defendants' connections to California, the *Tamburo* defendants' publication of Tamburo's Illinois address and encouragement to others to harass him there, and a Ninth Circuit defendant's "broader scheme of registering prominent trademarks as domain names for the purpose of extorting money from the marks' owners." See *id.*

The court "boil[ed] down" its inquiry further – and invoked *Tamburo* but not *Calder* itself – in *be2 LLC v. Ivanov*, 642 F.3d 555, 558 (7th Cir. 2011). In *be2*, the court asked whether defendant "purposely exploited the Illinois market" in his alleged capacity as the co-founder and CEO of be2.net, a dating website that competed with plaintiff's be2.com. *Id.* at 556, 558. The court concluded that the defendant had not, because he had not "deliberately targeted or exploited the Illinois market." *Id.* at 559. The record showed that "just 20 persons who listed Illinois addresses had at some point created free dating profiles on be2.net," and the court reasoned that "[e]ven if these 20 people are active users who live in Illinois, the constitutional requirement of minimum contacts is not satisfied simply because a few residents have registered accounts on be2.net." *Id.* The court deemed these contacts "attenuated" and held that they "could not give rise to personal jurisdiction without offending traditional notions of fair play and substantial justice." *Id.* The court distinguished the case from *uBid* by pointing out the lack of evidence that defendant targeted the Illinois market and his lack of interactions with the be2.net members from Illinois. See *id.* The case was more like *Mobile Anesthesiologists*, the court concluded, "where the accessibility of the website in Illinois was not sufficient to show conduct targeted at the state." *Id.*

In its most recent case examining personal jurisdiction in the context of intentional torts, *Felland v. Clifton*, 682 F.3d 665 (7th Cir. 2012), the Seventh Circuit reiterated that its inquiry "focuses on whether the conduct underlying the claim[ ] was purposely directed at the forum state." *Felland*, 682 F.3d at 674 (quoting *Tamburo*, 601 F.3d at 702). The court found that the first and third requirements of the "express aiming" test were easily satisfied because the defendant allegedly made intentional misrepresentations and "there [was] no doubt that [defendant] knew the alleged harm would be felt in Wisconsin." *Id.* at 675. The court noted that defendant "knew from the beginning" that the plaintiffs were Wisconsin residents, that several documents possessed and signed by defendant noted that fact, and that defendant "directed multiple communications via several different media" to the plaintiffs' Wisconsin home. *Id.* The court also found the second element (express aiming at the forum state) satisfied because plaintiffs alleged that defendant's communications to them in Wisconsin lulled them into a false sense of security and induced them to become further entrenched in defendant's fraud. See *id.* at 676. In other words, there was "injury plus."

The Court takes several important lessons from this line of cases. First, the "express aiming" test cannot be satisfied merely by allegations of intentional tortious conduct. "Something more" is needed. *Tamburo*, 601 F.3d at 706; see also *Mobile Anesthesiologists*, 623 F.3d at 447 (noting that "*Calder* requires more" than accusations "of an intentional tort"); *uBid*, 623 F.3d at 427 n.1 (reconciling *Tamburo*, *Wallace*, and *Indianapolis Colts* on the basis that all three require "'something more' beyond injury in the forum state from an alleged tort"). In the Internet context, that means that plaintiffs "must still prove that the defendant had constitutionally sufficient contacts with the forum and that the defendant's contacts were temporally and substantively related to the lawsuit. Without that showing, the mere fact that the

defendant allegedly caused harm by conducting business or advertising over the Internet is not adequate to establish jurisdiction in the plaintiff's chosen forum state." *uBid*, 623 F.3d at 431; see also *Hemi Grp.*, 622 F.3d at 758. Second, the "something more" must relate to the forum state and cannot be satisfied by "the plaintiff's mere residence in the forum state." *Mobile Anesthesiologists*, 623 F.3d at 447. That is, the defendant must have some knowledge that the plaintiff lives or does business in the forum state or act specifically with the purpose of inflicting harm to the forum. *Tamburo*, 601 F.3d at 708; see also *Mobile Anesthesiologists*, 623 F.3d at 445 n.1 (noting that referring to the "express aiming" test as such "properly focuses attention on whether the defendant intentionally aimed its conduct at the forum state, rather than on the possibly incidental and constitutionally irrelevant effects of that conduct on the plaintiff"). Third, the specific nature and substance of the alleged contacts remains significant even under the "express aiming" test. The differences in the nature of the American and Australian defendants' contacts with the forum in *Tamburo*, for instance, were crucial to the court in concluding that the former was subject to personal jurisdiction but the latter was not. Indeed, the "express aiming" test need not even enter the analysis if a defendant's deliberate exploitation of the forum state is sufficiently robust. See *uBid*, 623 F.3d at 427 n.1. And, finally, Internet-based contacts do not give rise to any particularly expansive or special minimum contacts test. See *uBid*, 623 F.3d at 432; *id.* at 431 n.1; *Hemi Grp.*, 622 F.3d at 758-59; *Tamburo*, 601 F.3d at 703 n.7. But see *Walden*, 2014 WL 700098, at *7 n.9 (expressly leaving open "questions about virtual contacts" and "intentional torts * * * committed via the Internet or other electronic means"). Regardless of how the minimum contacts analysis is framed, or the medium through which the contacts are made, the bottom line inquiry is whether the nature of the relationship among the defendant, the forum, and the litigation makes it fair to exercise jurisdiction over the

defendant.  See *uBid*, 623 F.3d at 433; see also *Walden*, 2014 WL 700098, at *8 ("The proper focus of the 'minimum contacts' inquiry in intentional-tort cases is 'the relationship among the defendant, the forum, and the litigation.'" (quoting *Calder*, 465 U.S. at 788)).

That relationship is tenuous at best here.  Plaintiff has alleged that Defendant intentionally used Plaintiff's trade name and mark in a Google ad, thereby infringing on Plaintiff's trademark, defaming and disparaging Plaintiff, and interfering with Plaintiff's business.[2]  This is enough to satisfy the first element of the "express aiming" test.  See *Tamburo*, 601 F.3d at 704.  Plaintiff's allegations fail to satisfy the second and third elements, however.  Following the lead of the Seventh Circuit, the Court treats these two elements together.  See *id.*

The content of Defendant's Google ad had nothing to do with Illinois, and Plaintiff has not alleged that the ad was specifically aimed at Illinois or even viewed by customers or potential customers in Illinois. The only connection between Defendant's allegedly tortious ad and the forum state is Plaintiff's location there.  The same is true of Defendant's use of the allegedly infringing and confusing "WoundRights" mark.  "But the plaintiff cannot be the only link between the defendant and the forum."  *Walden*, 2014 WL 700098, at *5.  Under Supreme Court precedent, as interpreted in the *Tamburo* line of cases, "something more" is required; "mere injury to a forum resident is not a sufficient connection to the forum."  *Walden*, 2014 WL 700098, at *7.  Otherwise, defendants could be haled into court anywhere anytime a plaintiff alleged an intentional tort, and the *Tamburo* line of cases makes clear that the "express aiming" test "need not and should not be read quite so broadly."  *uBid*, 623 F.3d at 427 n.1.  The Seventh Circuit accordingly has held that personal jurisdiction is proper under the "express aiming" test only where the allegedly tortious conduct is somehow connected to the forum state.  In other

---

[2] This is not to say that Plaintiff's allegations necessarily can or have overcome Defendant's Rule 12(b)(6) motion to dismiss these counts.  Because the Court concludes that it lacks personal jurisdiction over Defendant, it cannot and does not reach the merits of the 12(b)(6) motion.

words, "[t]he proper question is not where the plaintiff experienced a particular injury or effect but whether the defendant's conduct connects him to the forum in a meaningful way." *Walden*, 2014 WL 700098, at *7. For instance, in *Tamburo*, the American and Canadian defendants expressly encouraged the boycott of the plaintiff's products and supplied his address in some of their messages – and did both with the full knowledge that plaintiff lived and worked in Illinois and would be harmed there. See *Tamburo*, 601 F.3d at 706. The court found jurisdiction over those defendants, but not over the Australian defendant that did not know that Tamburo resided in Illinois or specifically seek to cause harm there. See *id.* at 708. Similarly, in *Walden*, the Supreme Court concluded that "[p]etitioner's actions in Georgia did not create sufficient contacts with Nevada simply because he allegedly directed his conduct at plaintiffs whom he knew had Nevada connections." *Walden*, 2014 WL 700098, at *7.

Regardless of whether Defendant knew that Plaintiff was located in Illinois, see [27] ¶¶ 10, 39; [29-2] ¶¶ 17-18, the "injury plus" (and minimum contacts) requirement is not met here, particularly if *Calder* in fact "require[s] a showing that the defendant intended to reach forum-state readers." *Tamburo*, 601 F.3d at 708 n.10. None of Defendant's alleged contacts – its website, Facebook page, Twitter feed, and conference-based marketing efforts – was targeted or aimed at Illinois, or prompted any more than happenstance interactions with Illinois residents or businesses. Defendant has not distributed its product in Illinois, and it has not expressly sought to do so. Its affidavits[3] demonstrate that it has not exploited or benefited from the Illinois market in any measurable way, a point that Plaintiff's amended complaint implicitly concedes. This

_____

[3] Plaintiff has intimated that Defendant's affidavit "lacks complete credibility," [33] at 7 n.3; see also [40] at 2 (alleging that the affidavit contains "numerous misrepresentations and half-truths"), but the affidavit is not so facially incredible that the Court finds it appropriate to disregard at this stage. Contra *be2 LLC v. Ivanov*, 642 F.3d 555, 557-58 (7th Cir. 2011). Moreover, Plaintiff has not countered Defendant's evidence with anything beyond conclusory and inflammatory allegations as to its veracity. See *Purdue Research Found. v. Sanofi-Synthelabo, S.A.*, 338 F.3d 773, 783 (7th Cir. 2003).

makes Plaintiff more like the defendant anesthesiologist in *Mobile Anesthesiologists*, or the defendant "CEO" in *be2* than the defendant in *uBid*. The latter purposely exploited and benefited substantially from the Illinois market, whereas the former simply had incidental, *de minimis*, and constitutionally inadequate Internet contacts with Illinois. The same is true of Defendant. Accordingly, the Court grants in part Defendant's omnibus motion to dismiss [28], for lack of personal jurisdiction.

Plaintiff seeks to avoid this result by requesting jurisdictional discovery to "determine how much WoundRight knew about WoundRounds (or Telemedicine), and whether WoundRight has other minimum contacts with Illinois, in addition to its electronic entry into Illinois and its intentional tortious conduct[ ] directed at Illinois and Illinois consumers." [40] at 8. This request respectfully is denied. Plaintiff has provided the Court with 17 exhibits spanning approximately 75 pages, see [27] & [27-1], and, after carefully reviewing these documents, the Court has been unable to locate even a single explicit reference to Illinois or any suggestion that Defendant may purposely have targeted Illinois or its residents. Moreover, Plaintiff has not indicated what it expects to uncover through jurisdictional discovery that could establish minimum contacts beyond the contacts already alleged (and thus accepted as true unless specifically refuted, see pg. 11, *supra*) in relation to this case. It appears that Plaintiff hopes to establish general jurisdiction by searching for contacts beyond those related to this case. The Court is skeptical that Plaintiff could establish general jurisdiction where contacts with the forum state are insufficient to support specific jurisdiction. General jurisdiction "means that the defendant can be required to answer any claim that arose anywhere in the world" and "requires that the defendant be 'essentially at home' in the forum." *Abelesz v. OTP Bank*, 692 F.3d 638, 651 (7th Cir. 2012). Nothing in this case suggests that Defendant is "essentially at home" here.

And to the extent that Plaintiff believes that Defendant may be subject to general jurisdiction or has other, more robust contacts with Illinois, the pertinent contacts should be publicly discernible – just like the collection of exhibits that Plaintiff already has assembled and presented to the Court.

The Seventh Circuit has held that "[a]t a minimum, the plaintiff must establish a colorable or prima facie showing of personal jurisdiction before discovery should be permitted." *Cent. States, Se. & Sw. Areas Pension Fund v. Reimer Express World Corp.*, 230 F.3d 934, 946 (7th Cir. 2000). Because Plaintiff has failed to make such a prima facie showing, and has not indicated how additional discovery from Defendant would enable it to do so, the Court in its discretion denies the request for jurisdictional discovery.

## III. Conclusion

For the reasons stated above, the Court grants Defendant's motion to dismiss for lack of personal jurisdiction. [28]. Because the Court lacks personal jurisdiction over Defendant, it does not assess the merits of Defendant's alternative requests to dismiss for improper venue, transfer venue, and to dismiss certain counts of Plaintiff's amended complaint for failure to state a claim. See *Walden*, 2014 WL 700098, at *3 n.5 ("Because we resolve the case on jurisdictional grounds, we do not decide whether venue was proper in Nevada.").[4] The case is dismissed without prejudice to re-filing in a forum that may exercise personal jurisdiction over Defendant.

Dated: March 14, 2014

_____
Robert M. Dow, Jr.
United States District Judge

---

[4] To the extent that the Court has considered the parties' arguments on the venue issue, the Court would be inclined to transfer venue to the District of Wyoming pursuant to 28 U.S.C. § 1404(a), if it had jurisdiction to do so.